**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

API AMERICAS INC., )
)
            Plaintiff, ) Case No. 17-CV-02617-HLT-KGG
)
      v. )
)
PAUL W. MILLER, )
)
          Defendant. )

**MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

As stated in the Pretrial Order (Doc. 46), Plaintiff API has multiple causes of action asserted against Defendant Miller.[1] In this Motion for Partial Summary Judgment, API moves for judgment as a matter of law on two of those Counts: (a) violation of the federal Defend Trade Secrets Act (Count V); and (b) violation of the Kansas Uniform Trade Secrets Act (Count VI). Applicable federal and state law entitle API to recover its reasonable attorneys' fees from Miller, due to his willful and malicious misappropriation of API's trade secrets. API brings the instant motion because, if successful, it may, as a practical matter, obviate the need for trial on all remaining claims in this lawsuit.

Not only are the facts material to the instant motion uncontroverted, but they are also largely *stipulated* to by the parties. Consequently, to accomplish the stated purposes of the Federal Rules of Civil Procedure,[2] partial summary judgment should be entered in favor of API and against Miller for the reasonable attorneys' fees incurred or expended by API in this action. API would then ask for leave of Court to employ the procedures of Local Rule 54.2 to consult

---

[1] *See* Doc. 46, at § 4(a).

[2] *E.g.*, *Conrad v. Bd. of Johnson Cty. Comm'rs*, 237 F. Supp. 2d 1204, 1230 (D. Kan. 2002) (citing Fed. R. Civ. P. 1) (summary judgment is an important procedure designed to secure the just, speedy, and inexpensive determination of every action).

with Miller and his counsel regarding what award would constitute reasonable attorneys' fees, or such other procedure as the Court may deem just and proper.

## A.     STATEMENT OF UNCONTROVERTED MATERIAL FACTS.

Most of the following uncontroverted material facts are taken directly from the stipulated facts set forth on pages 2–12 of the Pretrial Order (Doc. 46). API cites, as appropriate, to the stipulated facts as "**SF**" below. API presents a few additional material facts as set forth below.

1.      Plaintiff API Americas Inc. f/k/a API Universal Foils Inc. f/k/a API Foils, Inc. ("API") is a corporation organized, existing, and in good standing under the laws of the State of Delaware. API is registered and in good standing to do business in Kansas as a foreign corporation.  API is also registered and in good to do business in New Jersey. Doc. 46, at § 2(a), SF 1.

2.      API is in the business of designing, manufacturing and distributing hot stamping foils and other products. The company's business depends on its unique technology, manufacturing processes, marketing strategies, customer and prospective customer relationships, and its business models and strategies. Doc. 46, at SF 2.

3.      As stated on its website, "API is a leading manufacturer and distributor of foils, laminates and holographic materials which provide exceptional brand enhancement for consumer goods and printed media worldwide. With roots in the British paper industry, the company's reputation is founded on a trading history going back over a century." Additionally, "[o]perating from thirteen locations across Europe, America and Asia, API's packaging solutions enable companies across a wide-range of industry sectors including premium drinks, confectionery, tobacco, perfumery, personal-care, cosmetics and healthcare to empower their brands on the shelf and in the hand." Doc. 46, at SF 3.

2

4.      In particular, as just one of countless examples, "[t]he greeting cards and gift wrap industries have traditionally been big users of metallic and holographic foils, with greeting card producers and their sub-contractors being some of API's biggest customers." www.apigroup.com/markets/greeting-cards-and-gift-wrap. Doc. 46, at SF 4.

5.      Hallmark is an existing and valued customer of API. Hallmark has been a customer of API since approximately 2000. Doc. 46, at SF 5.

6.      In addition to its facility at 3841 Greenway Circle, Lawrence, Kansas 66046, where Miller worked, API also has facilities throughout the United States (and world), including in California, Indiana, and New Jersey. Doc. 46, at SF 6.

7.      UNIVACCO Foils Corporation ("Univacco") is a direct competitor of API, and describes itself as "a global manufacturer of Hot Stamping Foils, Cold Foils, Holographic Foils and Special Effect Foils (SEF). As the American office of UNIVACCO Technology Inc., we are positioned to offer our North and South American customers an entire suite of foils to serve their needs in packaging, labeling, and beyond. Our operations are backed by the commitment and know-how of more than 700 employees worldwide." www.univaccofoils.com. Doc. 46, at SF 7.

8.      As part of its "Vision," Univacco declares its goal "[t]o be one of the top foil manufacturers in the world," and [t]o provide customer-driven innovation." Doc. 46, at SF 8.

9.      In June 2007, Defendant Miller started working at API. He began as a Customer Service Representative, and over the years, was promoted to Customer Service Manager and then Technical Service and Account Manager. In his role as a Technical Service and Account Manager, Miller's major job duties and responsibilities included, but were not limited to supporting API's customers, sales and CSR groups with technical knowledge on how foil is applied on all types of application equipment; supporting the sale of API's laminates; managing

3

the outflow and follow up of trial samples to customers; evaluating and reviewing complaint material and forwarding to the technical department for evaluation and any necessary follow up; assisting in API's activities at all customer trade shows; assisting manufacturing in product quality control and quality assurance of products; ensuring the product recommended would perform as expected and provide the know-how so as to consult with the customer; and managing the outflow of trial samples to customers. Further, API entrusted Miller as the Account Manager for Hallmark effective the Third Quarter of 2016. Doc. 46, at SF 9.

10.     During his employment with API, Miller acquired significant confidential and proprietary information and trade secrets of API, in particular concerning one of API's largest customers, Hallmark, and other Key accounts of API throughout the United States, including without limitation: (a) access and knowledge concerning API's quality information related to testing and customers; (b) access and knowledge concerning API's Tropos system where customer information is held and maintained; (c) access and knowledge concerning Hallmark's sales history and personal sales results; (d) access and knowledge concerning API's base price list and guidelines for all existing and prospective customers; (e) access and knowledge concerning relative profitability of API's product lines; (f) access and knowledge stemming from his participation in API meetings in which strategies were discussed and evaluated including sales and operations functions; and (g) access and knowledge concerning API's future investments for current and prospective projects.  Doc. 46, at SF 10.

11.     On July 6, 2011, Miller and API entered into a written Employee Confidentiality, Non-Solicitation and Non-Competition Agreement ("Agreement"). Doc. 46, at SF 11.

12.     The Agreement states, in part, that Miller and API understand and agree that:

[API] is in the business of designing, manufacturing and distributing hot stamping foils and other products, that [API's] business depends on its unique technology,

4

manufacturing processes, marketing strategies, customer and prospective customer relationships, and products, potential products and its business models and strategies;

* * *

[API] spends substantial time, money and effort in identifying its customers, learning their business needs, and designing manufacturing and distributing products to meet those needs;

* * *

[API] is engaged in the hot stamping foils business on a nationwide basis and has and solicits customers throughout the United States; and

* * *

through employment with [API] [Miller] will gain valuable information and knowledge concerning [API's] business and the business of [API's] customers and that if [Miller] were to compete with [API] in its business through the use of that information and knowledge, [API] would be severely and irreparably injured[.]

Doc. 46, at SF 12.

13.     In Section 5 of the Agreement, Miller agreed that "[f]or purposes of analysis and interpretation of this Agreement, New Jersey law shall apply and control." Doc. 46, at SF 13.

14.     Miller admits that the Agreement was, and is, supported by sufficient consideration. Doc. 46, at SF 14.

15.     Under Section 1(a) of the Agreement, Miller "acknowledge[d] that during his employment with [API] he will have access to and become familiar with information and documents containing information in which [API] and in some cases [API's] customers have a proprietary interest ('Confidential Information')." Doc. 46, at SF 15.

16.     Section 1(a) further states, in part: "The Confidential Information which [API] and/or its customers have a proprietary interest includes, but is not limited to:" the identity of customers; the identity of customers' contact persons; customers' needs; customers' budgets and expenditures; API's marketing strategies; rates/pricing charged to customers; market research;

5

means and methods of API's operations; plans/concepts for business development; methodology

of sourcing new business; training materials; concepts, uses and applications for computer

interactive technologies; API and customer financial data; employee information, including

salary and benefit information; formulas; manufacturing processes; new product plans; research

and development efforts; product specification; machinery specifications; vendor/supplier

sources; materials sources; material pricing; and profit margins. Doc. 46, at SF 16.

17.     In addition, Section 1(a) also enumerates a non-exclusive list of 31 categories of

API's documents that contain Confidential Information in which API and/or its customers have a

proprietary interest, defined as "Confidential Documents" therein. Doc. 46, at SF 17.

18.     Section 1(b) of the Agreement states:

With respect to Confidential Documents and Confidential Information, [Miller] shall not:

(i)  Disclose, use or provide any of the Confidential Information or Confidential Documents directly or indirectly to anyone, including anyone associated with or employed by [API], except as required in [Miller's] performance of his duties on behalf of [API]; and

(ii)  Disclose, use or provide any of the Confidential Information or Confidential Documents either during employment or any time thereafter, for his own benefit or for the benefit of any third party.

Doc. 46, at SF 18.

19.     Section 1(c) of the Agreement states:

[Miller] agrees that all Confidential Information and Confidential Documents, proprietary information and trade secrets in whatever form shall remain the exclusive property of [API] and/or its customers and [Miller] will shall not remove such documents from [API's] premises without the prior consent of [API]. [Miller] shall return all Confidential Information or Confidential Documents and copies in whatever form including but not limited to notes, drawings, video/audio tapes, and computer programs, disks, and duplicated information in his possession and any copies, to [API] immediately upon termination of employment.

Doc. 46, at SF 19.

20.     Miller agreed that he would not disclose, use, or provide any of the Confidential Information or Confidential Documents either during his employment or any time thereafter, for his own benefit or for the benefit of any third party. Doc. 46, at SF 20.

21.     Miller further agreed that he would not remove Confidential Information or Confidential Documents from API's premises without the prior consent of API. Doc. 46, at SF 21.

22.     Miller also agreed that *immediately* upon termination of his employment he would return all Confidential Information and Confidential Documents in whatever form. Doc. 46, at SF 22.

23.     Under Section 2(a) of the Agreement, Miller agreed that "[d]uring [his] employment with [API], [he], without the express prior written consent of [API], will not compete or make preparations to compete in any way, directly or indirectly, with [API], in the hot stamping foils business and will not consult with . . . any business firm, partnership corporation, or other entity . . . which competes with [API], in any way, directly or indirectly, in the hot stamping foils business or any other business in which [API] is engaged during his employment or in any aspect of [API's] business." Doc. 46, at SF 23.

24.     Under Section 2(c) of the Agreement, Miller agreed that "[d]uring the period of one (1) year following the date of termination of [his] employment with [API], [he] without the express prior written consent of [API], will not compete in any way, directly or indirectly, with [API] in the hot stamping foils business or any other business in which [API] is engaged during his employment or in any aspect of [API's] and will not consult with, provide services to, be employed by or have any interest in any business, firm, partnership, corporation or other entity, whether as employee, officer, director, agent, security holder, creditor, consultant, independent

7

contractor or otherwise, which competes in any way, directly or indirectly with [API] in the hot stamping foils business or in any aspect of [API's] business." Doc. 46, at SF 24.

25.     Under Section 3(a) of the Agreement, Miller agreed that "[d]uring the period of one (1) year following the date of termination of [his] employment with [API], [he] will not directly or indirectly contact, induce, entice or in any way attempt to solicit the hot stamping foils business of any of [API's] customers or Prospective Customers. For purposes of this Agreement, a 'Prospective Customer' is any entity or individual for which [API] has invested time, money and effort in soliciting as a customer during [Miller's] employment." Doc. 46, at SF 25.

26.     Under Section 3(b) of the Agreement, Miller agreed that "[d]uring the period of one (1) year following the date of termination of [Miller's] employment with [API], [he] will not directly or indirectly, induce, entice, solicit, or hire or attempt to solicit, hire ore employ any employee of [API]." Doc. 46, at SF 26.

27.     In Section 3(c) of the Agreement, Miller agreed "that these . . . non-solicitation covenants . . . are reasonable and necessary to protect the legitimate interests of [API] and that his violation of any of these covenants will result in immediate, irreparable and substantial harm to [API] and its business. Therefore, [Miller] agree[d] that [API] is entitled to preliminary and permanent injunctive relief and any other remedies which are available to enforce these covenants and recover damages for their breach." Doc. 46, at SF 27.

28.     In Section 3(c), Miller further agreed "that these covenants are the essence of this Agreement and shall survive the termination of employment and are enforceable separately from this Agreement." Doc. 46, at SF 28.

8

29.     In May of 2017, Hallmark notified API that it was seeking Request for Quote ("RFQ") proposals for its folio business, which business API had previously provided. Doc. 46, at SF 29.

30.     On May 12, 2017 (while Miller served as API's Account Manager for API's existing customer Hallmark), Miller was copied on an email in which Hallmark notified API that RFQ would be due on August 15, 2017 with results to be completed by September 15, 2017. Doc. 46, at SF 30.

31.     On July 27, 2017, Miller participated in a strategy meeting with API management to review the Hallmark RFQ. Doc. 46, at SF 31.

32.     On August 15, 2017, Bob Almer (API's Vice President of Sales, and Miller's direct manager) submitted API's response to Hallmark's RFQ, on which Miller was copied. Miller contributed to API's response/proposal in his role as the Hallmark Account Manager. Doc. 46, at SF 32.

33.     On August 15, 2017, Miller forwarded to his personal email account the email with API's response and attachments, which contained confidential and proprietary information regarding API's business set forth in the proposal to Hallmark. Doc. 46, at SF 33.

34.     On August 16, 2017, Miller emailed to his personal email account API Quality documents which again contained confidential and proprietary information of API. Doc. 46, at SF 34.

35.     On August 31, 2017, Miller emailed to his personal email account an API Customer Information Query, which contained confidential and proprietary information of API. Doc. 46, at SF 35.

9

36.     On September 7, 2017, API presented Hallmark with a Quality Improvement Plan that Miller had helped prepare to address application issues with some of the foils. Doc. 46, at SF 36.

37.     On Friday, September 8, 2017, Miller organized and managed a meeting with Hallmark executives and API management to follow up on API's response/proposal to the RFQ, a plant tour, and to review open quality and product development activities. During this meeting, the parties discussed API's plans for the future of the Lawrence, Kansas operations and improvements for the foil applications at Hallmark. Doc. 46, at SF 37.

38.     On Monday, September 11, 2017, at 8:30 A.M., Miller emailed API with his unexpected notice of resignation. Doc. 46, at SF 38.

39.     On September 13, 2017, Miller advised his manager, Almer, that Hallmark would be *delaying* the results of their RFQ process from the previously-stated date of September 15, 2017 (for Hallmark's decision in response to the RFQ) to October 15, 2017. Miller indicated that the reason for the delay was so that Hallmark could "test other foils." Doc. 46, at SF 39.

40.     On September 14, 2017, Miller spoke with API's Human Resources Manager, Leslie Smith, and asked if he had a non-compete agreement with API. She advised him that he did and showed him a copy, which is the same Agreement attached to this Complaint. Doc. 46, at SF 40.

41.     On September 21, 2017, Almer emailed Hallmark's Purchasing Manager, Trish Meaney, and advised her that Miller was resigning from API. Doc. 46, at SF 41.

42.     September 22, 2017 was Miller's last day with API. Doc. 46, at SF 42.

10

43.     When Miller left his employment with API, he did not return any of the confidential or proprietary information that he emailed to his home email.  This information was not returned to API until after the TRO was entered in this case. Doc. 46, at SF 43.

44.     On or before October 12, 2017, Miller accepted employment with API's direct competitor, Univacco, as its Midwest Sales Manager. Doc. 46, at SF 44.

45.     On or about October 13, 2017, Miller went to Massachusetts for training with Univacco. Doc. 46, at SF 45.

46.     On or about October 16, 2017, under Univacco's employ, Miller went to Hallmark's facility in Lawrence, Kansas to test Univacco's foils with Hallmark.  Miller produced a report for Univacco to provide to Hallmark. Doc. 46, at SF 46.

47.     On October 18, 2017, API sent a letter to Miller demanding written assurances that he had not taken "employment with a direct competitor of API" or "if you have taken such a position that you will resign from it immediately." Doc. 46, at SF 47.

48.     Miller did not respond to API's October 18, 2017 letter by October 23, 2017 and API then filed the instant action. Doc. 46, at SF 48.

49.     A TRO was entered in this case on November 7, 2017 (Doc. No. 18). Doc. 46, at SF 49.

50.     While employed by API, Miller had VPN access to the aforementioned trade secrets, such that he could access them without needing to send them to his personal email account. Ex. A, L. Smith Aff., at ¶ 11; Ex. B, P. Miller Dep. 52:19–22.

51.     During Miller's employment, he acquired multiple trade secrets of API, in particular concerning one of API's largest customers, Hallmark, and other Key accounts of API throughout the United States, including: . . . API's quality information related to testing and

11

customers; . . . API's Tropos system where customer information is held and maintained; . . . Hallmark's sales history and personal sales results; . . . API's base price list and guidelines for all existing and prospective customers; . . . relative profitability of API's product lines; . . . sales and operations functions; and . . . API's future investments for current and prospective projects. Ex. A, at ¶ 5.

52.     As the owner of these trade secrets, API took reasonable means to keep them secret, including requiring all employees, such as Miller, to sign non-disclosure and non-compete agreements. Ex. A, at ¶ 6.

53.     The trade secrets are not readily ascertainable by anyone outside of API by proper means. Ex. A, at ¶ 7.

54.     The trade secrets were and are of value to API, and important in the conduct of its business. Ex. A, at ¶ 8.

55.     API derives independent economic value from keeping the information secret, such as its customer lists, sales results, and product lines. Ex. A, at ¶ 9.

56.     API has incurred and expended significant attorneys' fees as the result of Miller's unlawful and improper actions, specifically including his willful and malicious misappropriation of API's trade secrets. Ex. A, L. Smith Aff., at ¶ 12.

**B.      STATEMENT OF THE CASE.**

*As stipulated*,[3] Defendant Miller was employed by Plaintiff API for over a decade, until September of 2017, when he voluntarily and unexpectedly resigned. During the course of this employment with API, Miller acquired significant confidential and proprietary information and trade secrets of API, including but not limited to API's product formulations/recipes, pricing,

---

[3] *See generally,* Doc. 46, Pretrial Order, at ¶ 2(a), SF 9.

quality control, and other strategies with API's customers. To protect the confidential and proprietary information that Miller was privy to during this employment, Miller entered into an Employee Confidentiality, Non-Solicitation, and Non-Competition Agreement ("Agreement"), which prohibited, among other things, Miller's use or disclosure of API's confidential and proprietary information or trade secrets for his own benefit or the benefit of third parties, as well as the employment with a direct competitor (as specifically defined in the Agreement).

Despite Miller's agreement to these terms, API learned (*and Miller has stipulated*) that prior to Miller's departure from API, Miller downloaded and emailed certain trade secrets, and other confidential and proprietary information, all belonging to API, to his personal email account, as detailed below. API also learned (*and Miller has stipulated*) that Miller had become employed by Univacco, a direct competitor of API, as its Midwest Sales Manager, working in the very same territory that he did with API, and calling on one of API's largest customers in that area, Hallmark Cards, Inc., for whom API had entrusted Miller to serve as the Account Manager.[4] Unable to resolve the dispute through negotiations, API was forced to bring this lawsuit against Miller for damages and injunctive and other relief, wherein Miller has subsequently *stipulated* to most all of the wrongdoing alleged in API's Verified Complaint (Doc. 1).[5]

## C.    STANDARD OF REVIEW.

"Summary judgment is appropriate if the pleadings, depositions, other discovery materials, and affidavits demonstrate the absence of a genuine issue of material fact and that the

---

[4] *E.g.*, Doc. 46, at ¶ 2(a), SF 46 (admitting that on or about October 16, 2017, Miller—under Univacco's employ—went to Hallmark's facility in Lawrence, Kansas to test Univacco's foils with Hallmark.

[5] *See generally,* Doc. 15, Def.'s Answer; Doc. 46, at ¶ 2(a) (fact stipulations).

13

moving party is entitled to judgment as a matter of law."[6] "An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[7]

## D.     ARGUMENT AND AUTHORITIES.

API is not only entitled to judgment as a matter of law against Miller on its trade secrets claims under the federal Defend Trade Secrets Act of 2016, Public Law 114-153, 18 U.S.C. § 1836(b) ("DTSA") and the Kansas Uniform Trade Secrets Act ("KUTSA"), but it is also entitled to recover its attorneys' fees because Miller willfully and maliciously misappropriated API's trade secrets.

Although the DTSA and KUTSA use slightly different wording to define a trade secret, they essentially protect the same type of information. Both define a trade secret as information that: (a) the owner has taken reasonable means to keep secret; (b) derives independent economic value, actual or potential, from being kept secret; (c) is not readily ascertainable by proper means; and (d) others who cannot readily access it would obtain economic value from its disclosure or use.[8]

"Misappropriation of a trade secret occurs when the trade secret is disclosed or used without express or implied consent by a person who 'used improper means to acquire knowledge of the trade secret,' or by a person who 'at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.'"[9] "Actual or threatened misappropriation may be

---

[6] *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1242 (10th Cir. 2013) (citation and internal quotation marks omitted); *see also* Fed. R. Civ. P. 56.

[7] *Id.*

[8] 18 U.S.C. § 1839(3); K.S.A. § 60-3320(4); *see also Teva Pharm. USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 675 (E.D. Pa. 2018) (defining trade secret under the DTSA and the Pennsylvania Uniform Trade Secrets Act).

[9] *Universal Engraving, Inc. v. Duarte*, 519 F. Supp. 2d 1140, 1154 (D. Kan. 2007) (citing K.S.A. § 60-3320(2)(ii)(A), (B)(II)).

enjoined."[10] While API has not located a controlling decision regarding the recently-enacted DTSA, other federal district courts have stated that in order for a plaintiff to prevail, it must show that: (1) the information constitutes a trade secret; (2) the information was of value to the employer and important in the conduct of its business; (3) by reason of discovery or ownership the employer had the right to the use and enjoyment of the secret; and (4) the secret was communicated to the defendant while employed in a position of trust and confidence under such circumstances as to make it inequitable and unjust for him to disclose it to others, or to make use of it himself, to the prejudice of his employer.[11]

Here, API has met all of the elements of the Act (and in fact Miller has stipulated to almost every single element as well). In fact, as a result of his actions, injunctive relief was granted by this Court in favor of API, which remains in effect today.[12] This injunctive relief should be made permanent, and as shown below, API is also entitled to an award of its attorneys' fees.

First, API has shown, as a matter of law, that its information constitutes a trade secret.[13] Under the stipulated facts in the Pretrial Order, it is *stipulated* that Miller acquired multiple trade secrets of API:

> Miller acquired significant . . . trade secrets of API, in particular concerning one of API's largest customers, Hallmark, and other Key accounts of API throughout the United States, including: . . . API's quality information related to testing and customers; . . . API's Tropos system where customer information is held and maintained; . . . Hallmark's sales history and personal sales results; . . . API's base price list and guidelines for all existing and prospective customers; . . . relative

---

[10] *Id.* (citing K.S.A. § 60-3321(a)).

[11] *Freedom Med. v. Whitman*, 2018 U.S. Dist. LEXIS 184309, at *11 (E.D. Pa. Oct. 29, 2018).

[12] *See generally* Doc. 18, Temporary Restraining Order.

[13] *E.g.*, *WHIC LLC v. NextGen Labs., Inc.*, No. 18-00261 JMS-RLP, 2018 U.S. Dist. LEXIS 158380, at **32–35 (D. Haw. Sep. 17, 2018) (analyzing trade secrets under the DTSA).

profitability of API's product lines; . . . sales and operations functions; and . . . API's future investments for current and prospective projects.[14]

API, the owner of these trade secrets, took reasonable means to keep them secret, including requiring all employees, such as Miller, to sign non-disclosure and non-compete agreements.[15] The trade secrets are not readily ascertainable by anyone outside of API by proper means.[16] The trade secrets were and are of value to API, and important in the conduct of its business.[17] API derives independent economic value from keeping the information secret, such as its customer lists, sales results, and product lines.[18] By reason of ownership, API had the right to use and enjoy the trade secrets. The trade secrets were communicated to Miller while he was employed in a position of trust and confidence, and it would be inequitable and unjust for him to disclose them to others, such as API's direct competitor Univacco, or to make use of them himself, any of which would prejudice API. Others, such as Univacco or Miller, would obtain economic value from the disclosure or use of API's trade secrets.

Next, it is also clear that, under the circumstances, Miller knowingly misappropriated API's trade secrets when he used and sent them to his personal email address. By way of background, in May of 2017, Hallmark notified API that it was seeking Request for Quote ("RFQ") proposals for its folio business, which business API had previously provided to Hallmark.[19] On May 12, 2017 (while Miller served as API's Account Manager for API's existing

---

[14] Doc. 46, at § 2(a), SF 10. Further, Miller agreed that these trade secrets, in whatever form, "shall remain the exclusive property of [API] and/or its customers and [Miller] shall not remove such documents from [API's] premises without the prior consent of [API]." Doc. 46, at § 2(a), SF 19. Miller further agreed to return all trade secrets "in whatever form including but not limited to notes, drawings, video/audio tapes, and computer programs, disks, and duplicated information in his possession and any copies, to [API] immediately upon termination of employment." *Id.*

[15] Material Fact 51.

[16] Material Fact 52.

[17] Material Fact 53.

[18] Material Fact 54.

[19] Doc. 46, at SF 29.

16

customer Hallmark), Miller was copied on an email in which Hallmark notified API that RFQ would be due on August 15, 2017 with results to be completed by September 15, 2017.[20] On July 27, 2017, Miller participated in a strategy meeting with API management to review the Hallmark RFQ.[21] On August 15, 2017, Bob Almer (API's Vice President of Sales, and Miller's direct manager) submitted API's response to Hallmark's RFQ, on which Miller was copied.[22] Miller contributed to API's response/proposal in his role as the Hallmark Account Manager.[23]

Critically, later that day on August 15, 2017, as *stipulated*, Miller *misappropriated* that information, including API's trade secrets, when he forwarded to his personal email account the aforementioned August 15, 2017 email with API's response and attachments, including the trade secrets.[24] The email, designated as Miller Deposition Exhibit 11, and as Stipulated Exhibit 6, is incorporated herein, and will be submitted to the Court in accordance with the governing Protective Order (Doc. 28), *i.e.* pursuant to a motion to file under seal.

As further *stipulated*, Miller then *misappropriated* additional trade secrets on August 16, 2017, when he emailed to his personal email account API Quality documents.[25] Miller again *misappropriated* trade secrets when, on August 31, 2017, he emailed to his personal email account an API Customer Information Query.[26]

On September 7, 2017, API presented Hallmark with a Quality Improvement Plan that Miller had helped prepare to address application issues with some of the foils.[27] On Friday,

---

[20] *Id.* at SF 30.

[21] *Id.* at SF 31.

[22] *Id.* at SF 32.

[23] *Id.* at SF 32.

[24] *Id.* at SF 33.

[25] *Id.* at SF 34.

[26] *Id.* at SF 35.

[27] *Id.* at SF 36.

17

September 8, 2017, Miller organized and managed a meeting with Hallmark executives and API management to follow up on API's response/proposal to the RFQ, a plant tour, and to review open quality and product development activities.[28] During this meeting, the parties discussed API's plans for the future of the Lawrence, Kansas operations and improvements for the foil applications at Hallmark.[29]

On Monday, September 11, 2017, at 8:30 A.M., Miller emailed API with his unexpected notice of resignation.[30] On September 13, 2017, Miller advised his manager, Almer, that Hallmark would be *delaying* the results of their RFQ process from the previously-stated date of September 15, 2017 (for Hallmark's decision in response to the RFQ) to October 15, 2017.[31] Miller indicated that the reason for the delay was so that Hallmark could "test other foils."[32]

On September 14, 2017, Miller spoke with API's Human Resources Manager, Leslie Smith, and asked if he had a non-compete agreement with API.[33] She advised him that he did and showed him a copy, which is the same Agreement attached to the Complaint.[34]

On September 21, 2017, Almer emailed Hallmark's Purchasing Manager, Trish Meaney, and advised her that Miller was resigning from API.[35] September 22, 2017 was Miller's last day with API.[36]

---

[28] *Id.* at SF 37.

[29] *Id.*

[30] *Id.* at SF 38.

[31] *Id.* at SF 39.

[32] *Id.*

[33] *Id.* at SF 40.

[34] *Id.*

[35] *Id.* at SF 41.

[36] *Id.* at SF 42.

When Miller left his employment with API, he did not return any of the confidential or proprietary information that he emailed to his home email.[37] This information was not returned to API until after repeated demand by API and the TRO was entered in this case.[38]

On or before October 12, 2017, Miller accepted employment with API's direct competitor, Univacco, as its Midwest Sales Manager.[39] On or about October 13, 2017, Miller went to Massachusetts for training with Univacco.[40]

On or about October 16, 2017, under Univacco's employ, Miller went to Hallmark's facility in Lawrence, Kansas to test Univacco's foils with Hallmark.[41] Miller produced a report for Univacco to provide to Hallmark.[42]

On October 18, 2017, API sent a letter to Miller demanding written assurances that he had not taken "employment with a direct competitor of API" or "if you have taken such a position that you will resign from it immediately."[43] Miller did not respond to API's October 18, 2017 letter by October 23, 2017 and API then filed the instant action.[44] A TRO was entered in this case on November 7, 2017 (Doc. 18).[45]

It is further *stipulated* that Miller agreed that he would not disclose, use, or provide any of the trade secrets either during his employment or any time thereafter, for "his own benefit or for the benefit of any third party."[46] Miller also agreed that he would not remove trade secrets

---

[37] *Id.* at SF 43.

[38] *Id.*

[39] *Id.* at SF 44.

[40] *Id.* at SF 45.

[41] *Id.* at SF 46.

[42] *Id.*

[43] *Id.* at SF 47.

[44] *Id.* at SF 48.

[45] *Id.* at SF 49.

[46] *Id.* at SF 20.

30274045v.3

from API's premises without the prior consent of API.[47] Miller further agreed that *immediately* upon termination of his employment with API that he would return all trade secrets, in whatever form, to API.[48] Miller broke all of these agreements.

Miller further agreed that "[d]uring [his] employment with [API], [he], without the express prior written consent of [API], will not compete or make preparations to compete in any way, directly or indirectly, with [API], in the hot stamping foils business and will not consult with . . . any business firm, partnership corporation, or other entity . . . which competes with [API], in any way, directly or indirectly, in the hot stamping foils business or any other business in which [API] is engaged during his employment or in any aspect of [API's] business."[49] Miller also agreed that "[d]uring the period of one (1) year following the date of termination of [his employment] with [API], [he] will not directly or indirectly contact, induce, entice or in any way attempt to solicit the hot stamping foils business of any of [API's] customers or Prospective Customers."[50] Once again, Miller broke all of these commitments.

Consequently, the uncontroverted facts establish, as a matter of law, all of the necessary elements to sustain API's trade secret misappropriation claims under both the DTSA and KUTSA. The injunctive relief previously entered by the Court should be made permanent, as API is entitled to summary judgment on these grounds.

In addition, API is also entitled to summary judgment as to the recovery of its reasonable attorneys' fees against Miller in this case. Both the DTSA and KUTSA independently entitle API to such an award against Miller. First, the federal Defend Trade Secrets Act of 2016, Public Law 114-153, 18 U.S.C. § 1836(b) ("DTSA"), specifically 18 U.S.C. § 1836(b)(3)(D), entitles API to

---

[47] *Id.* at SF 21.

[48] *Id.* at SF 22.

[49] *Id.* at SF 23.

[50] *Id.* at SF 25.

recover its reasonable attorneys' fees as the result of Miller's willful and malicious misappropriation of API's trade secrets.

Second, Miller's violation of the Kansas Uniform Trade Secrets Act ("KUTSA") separately and independently entitles API to recover its reasonable attorneys' fees. As with the federal DTSA, KUTSA provides: "If . . . (iii) willful and malicious misappropriation exists, the court may award reasonable attorney's fees to the prevailing party."[51] Under either statute, "[w]illful" misappropriation generally means that it was done with actual or constructive knowledge of its probable consequences, and "malicious" misappropriation means that it was done with intent to cause injury.[52] "This standard encompasses both intentional misappropriation as well as misappropriation resulting from the conscious disregard of the rights of others."[53]

The *stipulated* facts establish, as a matter of law, that Miller intentionally and willfully misappropriated API's trade secrets to his personal email account.[54] While in the process of leaving API for employment with its direct competitor, Univacco, and luring API's existing customer Hallmark to his new employer, Miller had both actual and constructive knowledge of the probable consequences of his actions, especially considering the RFQ from Hallmark as well as Miller's critical role as API's direct Account Manager for customer Hallmark. In maliciously misappropriating API's trade secrets, the *stipulated* facts further show, as a matter of law, that Miller consciously disregarded API's rights in those trade secrets for his own personal gain and to the direct detriment and injury to API. Therefore, applicable federal and state law entitle API to an award of its reasonable attorneys' fees against Miller.

---

[51] *LendingTools.com, Inc. v. Bankers' Bank of Kan., N.A.*, 2018 Kan. App. Unpub. LEXIS 733, at *13 (Kan. Ct. App. Sep. 28, 2018) (unpub. op.) (citing K.S.A. § 60-3323(i)); *see also ICE Corp. v. Hamilton Sundstrand Corp.*, 432 F. App'x 732, 741 (10th Cir. 2011) (unpub. op.) (recognizing that this provision of KUTSA is identical to Section 4 of the Uniform Trade Secrets Act).

[52] 1 MILGRIM ON TRADE SECRETS § 1.01 (2018).

[53] 1-2 TRADE SECRETS: LAW AND PRACTICE § 2.13 (2017).

[54] SF 32–35.

**E.      CONCLUSION.**

For the reasons highlighted above, Plaintiff's Motion for Partial Summary Judgment should be granted.

<div style="margin-left:40%">

Respectfully submitted,

LATHROP GAGE LLP


By:   /s/ Jennifer M. Hannah
    Jennifer M. Hannah, KS #19111
    jhannah@lathropgage.com
    2345 Grand Boulevard, Suite 2200
    Kansas City, Missouri 64108
    Telephone: (816) 292-2000
    Telecopier: (816) 292-2001

    Mark A. Samsel, KS #24551
    msamsel@lathropgage.com
    10851 Mastin Boulevard, Suite 1000
    Overland Park, Kansas 66210-1669
    Telephone: (913) 451-5100
    Telecopier: (913) 451-0875

ATTORNEYS FOR PLAINTIFF

</div>

<div style="text-align:center">

**CERTIFICATE OF SERVICE**

</div>

I certify that on this 1st day of November, 2018, the foregoing was electronically filed with the Clerk of the Court by using the CM/ECF system, which will automatically forward an electronic copy to the following counsel of record:

Richard W. Martin, Jr.
MARTIN & WALLENTINE, LLC
130 N. Cherry, Ste. 201
Olathe, Kansas 66061
rmartin@kc-attorney.com
ATTORNEY FOR DEFENDANT

<div style="margin-left:40%">

 /s/ Jennifer M. Hannah
AN ATTORNEY FOR PLAINTIFF

</div>

<div style="text-align:center">22</div>

30274045v.3