## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| **API AMERICAS INC.,**<br><br>**Plaintiff,**<br><br>v.<br><br>**PAUL W. MILLER,**<br><br>**Defendant.** | **Case No. 2:17-cv-02617-HLT** |

## MEMORANDUM AND ORDER

Plaintiff API Americas Inc. filed this action alleging that a former employee, Defendant Paul Miller, misappropriated its trade secrets in an attempt to lure away business to a direct competitor. Currently before the Court are the parties' dueling motions for summary judgment. Plaintiff seeks summary judgment on two counts—Count V for violation of the federal Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 ("DTSA"), and Count VI for violation of the Kansas Uniform Trade Secrets Act, K.S.A. §§ 60-3320, *et seq.* ("KUTSA")—and on its prayer for attorney's fees under these statutes. Doc. 47. Defendant, in turn, moves for summary judgment on all twelve claims asserted by Plaintiff in this action.[1] Doc. 50.

The majority of the facts in this case are stipulated by the parties and, for the following reasons, the Court finds those facts entitle Plaintiff to relief on its claims for liability under the DTSA and the KUTSA. However, the Court finds a genuine issue of fact exists regarding whether Defendant "willfully" and "maliciously" misappropriated Plaintiff's trade secrets and,

---

[1] For purposes of clarity, the Court notes that, although the complaint begins with Count I and ends with Count XIII, Plaintiff (presumably inadvertently) omitted "Count IX." Therefore, the complaint only asserted twelve claims for relief. However, as discussed more fully in Part III.B, *infra*, Plaintiff has now abandoned several of its claims. Specifically, Plaintiff has made clear it is only seeking relief on Counts I through VI. Doc. 56 at 4-5. The Court therefore focuses its analysis of Defendant's motion for summary judgment only on his arguments with respect to those remaining claims.

accordingly, denies Plaintiff's request for summary judgment on its statutory fee claim. The Court further denies Defendant's competing motion for summary judgment.

## I.  BACKGROUND[2]

### A.  Defendant's Employment with Plaintiff

Plaintiff is a global designer, manufacturer, and distributor of "hot stamping foils" and other products. Doc. 46 at ¶¶ 2-3. Plaintiff's products are used across a variety of industries, although the greeting card and gift wrap industries traditionally comprise one of Plaintiff's largest customer bases. *Id.* at ¶¶ 3-4.

Defendant started working for Plaintiff in June 2007 as a Customer Service Representative and, at the time of his resignation in September 2017, held the position of Technical Service and Account Manager. *Id.* at ¶ 9. Although based at Plaintiff's facility in Lawrence, Kansas, Defendant had VPN access to Plaintiff's network enabling him to work from home. *Id.* at ¶ 6; Doc. 48 at 11 ¶ 50; Doc. 57 at 11 ¶ 50. In his role as a Technical Service and Account Manager, Defendant both provided technical knowledge of Plaintiff's products—by supplying information regarding how the foil is applied and assisting with quality control—and interfaced with Plaintiff's clients by managing outflow of trial samples, evaluating complaints and coordinating follow up, and assisting at trade shows. Doc. 46 at ¶ 9. Defendant therefore admits that, through his position with Plaintiff, he gained:

- Access and knowledge concerning Plaintiff's quality information related to testing and customers;

- Access and knowledge concerning the software used by Plaintiff to store and maintain customer information;

---

[2]  For purposes of summary judgment, the following facts are uncontroverted or recited in the light most favorable to the nonmoving party. The Court further notes that the parties stipulated to the overwhelming majority of these facts in the pretrial order (Doc. 46).

- Access and knowledge concerning customer sales history and personal sales results;

- Access and knowledge concerning Plaintiff's base price list and guidelines for all existing and prospective customers;

- Access and knowledge concerning relative profitability of Plaintiff's product lines;

- Access and knowledge stemming from his participation in meetings in which strategies were discussed and evaluated including sales and operations functions; and

- Access and knowledge concerning Plaintiff's future investments for current and prospective projects.

*Id.* at ¶ 10. Defendant further admits this information constitutes significant confidential and proprietary information and trade secrets of Plaintiff. *Id.*

As such, during his employment, Defendant entered into a written Employee Confidentiality, Non-Solicitation and Non-Competition Agreement ("Agreement") with Plaintiff governing the use and disclosure of such information. *Id.* at ¶ 11. Pursuant to the Agreement, Defendant manifested his understanding that Plaintiff's business "depends on its unique technology, manufacturing processes, marketing strategies, customer and prospective customer relationships, and products, potential products and its business models and strategies" and that Plaintiff "spends substantial time, money and effort in identifying its customers, learning their business needs, and designing[,] manufacturing and distributing products to meet those needs." *Id.* at ¶ 12. Defendant further acknowledged that, through his employment, he would gain valuable information and knowledge concerning Plaintiff's business and the business of its customers and, were he to use that information and knowledge to compete with Plaintiff, Plaintiff would be "severely and irreparably injured." *Id.* The issues raised in this action primarily implicate three

components of the Agreement: (1) the non-disclosure provisions, (2) the non-competition provisions, and (3) the non-solicitation provisions.

### 1.      Non-Disclosure Provisions

Section 1 of the Agreement governs the disclosure of so-called "confidential information" and "confidential documents"—i.e., information and documents in which Plaintiff or, sometimes, its customers have a proprietary interest. *Id.* at ¶¶ 15-17. Pursuant to Section 1(b) of the Agreement, Defendant agreed, in pertinent part, that he would not disclose, use, or provide any of the confidential information or documents—either during his employment or at any time thereafter—for his own benefit or for the benefit of any third party. *Id.* at ¶ 20. Under Section 1(c) of the Agreement, Defendant further agreed that he would not remove confidential information or documents from Plaintiff's premises without prior consent. *Id.* at ¶ 21. Defendant also agreed that, immediately upon termination of his employment, he would return all confidential information and documents to Plaintiff. *Id.* at ¶ 22.

### 2.      Non-Competition Provisions

Section 2 comprises the Agreement's non-competition provisions. Pursuant to Section 2(a), Defendant agreed that, during his employment, he would not, without express prior written consent of Plaintiff, "compete or make preparations to compete in any way, directly or indirectly," with Plaintiff in the hot stamping foils business. *Id.* at ¶ 23. Defendant also agreed he would not "consult with . . . any business[,] firm, partnership[,] corporation, or other entity . . . which competes with [Plaintiff], in any way, directly or indirectly, in the hot stamping foils business or any other business in which [Plaintiff] is engaged." *Id.* This non-competition provision was also extended one year beyond the date of termination of Defendant's employment by virtue of Section 2(c), which further provides that Defendant "will not consult with, provide services to, be employed by

or have any interest in any business, firm, partnership, corporation or other entity" that competes with Plaintiff. *Id.* at ¶ 24.

### 3. Non-Solicitation Provisions

Finally, Section 3 contains the Agreement's non-solicitation provisions. Pursuant to these provisions, Defendant agreed in pertinent part that, for one year following the date of his termination of employment with Plaintiff, he would not "directly or indirectly contact, induce, entice or in any way attempt to solicit the hot stamping foils business of any of [Plaintiff's] customers." *Id.* at ¶ 25. Defendant agreed this prohibition is "reasonable and necessary to protect the legitimate interests of [Plaintiff]" and, further, "that his violation of any of these covenants will result in immediate, irreparable and substantial harm to [Plaintiff] and its business." *Id.* at ¶ 27. To that end, Defendant further agreed Plaintiff is entitled to preliminary and permanent injunctive relief and any other remedies available to enforce the non-solicitation provisions and recover damages for their breach. *Id.*

### B. Hallmark RFQ

In May 2017, Hallmark Cards, Inc. ("Hallmark")—one of Plaintiff's largest existing customers—notified Plaintiff it was seeking Request for Quote ("RFQ") proposals for its folio business, which business Plaintiff had previously provided. *Id.* at ¶¶ 5, 29. Via email dated May 12, 2017, Hallmark notified Plaintiff that responses to its RFQ would be due on August 15, 2017, with a decision made by September 15, 2017. *Id.* at ¶ 30. Defendant, who was serving as Plaintiff's Account Manager for Hallmark at the time, was copied on the email. *Id.* Defendant subsequently participated in a strategy meeting with Plaintiff's management to review the RFQ. *Id.* at ¶ 31. On August 15, 2017, Bob Almer—Plaintiff's Vice President of Sales and Defendant's direct manager—submitted Plaintiff's response to the RFQ. *Id.* at ¶ 32. Almer copied

Defendant on the response, and Defendant had contributed to the response in his capacity as manager of the Hallmark account. *Id.*

In the weeks following the submission of Plaintiff's RFQ response, Defendant proceeded to send himself—from his business email account to his personal email account—several emails containing Plaintiff's business information:

- On August 15, 2017, Defendant forwarded from his business email account to his personal email account the email with Plaintiff's RFQ response and corresponding attachments. *Id.* at ¶ 33.

- On August 16, 2017, Defendant sent from his business email account to his personal email account "Quality" documents from Plaintiff. *Id.* at ¶ 34.

- On August 31, 2017, Defendant sent from his business email account to his personal email account a "Customer Information Query" from Plaintiff. *Id.* at ¶ 35.

Defendant concedes that each of these emails and corresponding attachments contained confidential and proprietary information of Plaintiff. *Id.* at ¶¶ 33-35.

On September 7, 2017, Plaintiff presented Hallmark with a Quality Improvement Plan that Defendant helped prepare to address application issues with some of Plaintiff's foils. *Id.* at ¶ 36. And, on September 8, 2017, Defendant organized and managed a meeting with Hallmark executives and Plaintiff's management to follow up on Plaintiff's response to the RFQ, provide a plant tour, and review open quality and product development activities. *Id.* at ¶ 37. During this meeting, the parties discussed Plaintiff's plans for the future of its Lawrence, Kansas operations and improvements for the foil applications at Hallmark. *Id.*

## C.    Defendant's Resignation and Employment with Univacco

On September 11, 2017, Defendant unexpectedly emailed Plaintiff his notice of resignation. *Id.* at ¶ 38. Two days after he tendered his resignation, on September 13, 2017,

Defendant advised Mr. Almer that Hallmark would be delaying the results of its RFQ process by one month. *Id.* at ¶ 39. Defendant indicated the reason for the delay was so Hallmark could "test other foils." *Id.* The next day, Defendant spoke with Plaintiff's Human Resources Manager, Leslie Smith, and asked if he had a non-compete agreement with Plaintiff. *Id.* at ¶ 40. Ms. Smith advised that he did and showed him a copy of the Agreement. *Id.*

On September 21, 2017, Mr. Almer emailed Hallmark's purchasing manager to advise her that Defendant was resigning from employment with Plaintiff. *Id.* at ¶ 41. Defendant's last day with Plaintiff was September 22, 2017. *Id.* at ¶ 42. When Defendant left, he did not return any of the documents or information he previously sent to his personal email account. *Id.* at ¶ 43. Defendant subsequently accepted employment with UNIVACCO Foils Corporation ("Univacco") on or before October 12, 2017, as its Midwest Sales Manager. *Id.* at ¶ 44. Univacco—which, like Plaintiff, is a global foils manufacturer—is a direct competitor of Plaintiff. *Id.* at ¶ 7. On or about October 16, 2017, while employed by Univacco, Defendant visited Hallmark's facility in Lawrence, Kansas, to test Univacco's foils with Hallmark. *Id.* at ¶ 46. Defendant later produced a report for Univacco to provide to Hallmark. *Id.*

### D. The Dispute

On October 18, 2017, Plaintiff sent a letter to Defendant demanding written assurance that he had not taken "employment with a direct competitor" of Plaintiff or, if he had, that he would resign from that position immediately. *Id.* at ¶ 47. After Defendant failed to respond to the letter by the stated deadline, Plaintiff filed this action on October 23, 2017, asserting claims for: (1) breach of contract (related to the non-disclosure provisions); (2) breach of contract (related to the non-competition provisions); (3) breach of contract (related to the non-solicitation provisions); (4) breach of the duty of good faith and fair dealing; (5) violation of the DTSA; (6) violation of

the KUTSA; (7) violation of the federal Computer Fraud and Abuse Act; (8) injunctive relief; (9) accounting; (10) conversion; (11) tortious interference with existing contractual relations; and (12) tortious interference with business expectancy. Doc. 1; Doc. 46 at ¶ 48.

Shortly after filing its complaint, Plaintiff also sought a temporary restraining order against Defendant, and the Court entered a TRO on November 7, 2017. Doc. 5; Doc. 18; Doc. 46 at ¶ 49.[3] The parties have now filed competing motions for summary judgment. Docs. 47, 50.

## II.     STANDARD

Summary judgment is appropriate where the moving party demonstrates that "there is no genuine dispute as to any material fact" and it is "entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In applying this standard, courts must view the facts and any reasonable inferences that might be drawn therefrom in the light most favorable to the non-moving party. *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994). "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III.    ANALYSIS

### A.     Plaintiff's Motion for Partial Summary Judgment (Doc. 47)

Plaintiff seeks summary judgment on Count V for violation of the DTSA, Count VI for violation of the KUTSA, and its request for reasonable attorney's fees pursuant to those statutes.

---

[3] Following entry of the TRO, Defendant returned to Plaintiff the documents and information he had emailed to his personal email account during his employment. Doc. 46 at ¶ 43.

Doc. 47. The Court addresses the parties' arguments with respect to each of these claims as follows.

### 1.    Violation of the DTSA and the KUTSA (Counts V and VI)

Plaintiff moves for summary judgment on two of its substantive claims in this action: Counts V and VI, which allege Defendant misappropriated Plaintiff's trade secrets in violation of the federal DTSA and its state-law counterpart, the KUTSA. In support of its request for summary judgment, Plaintiff argues simply that the uncontroverted facts (the majority of which were stipulated by the parties in the pretrial order) establish, as a matter of law, all necessary elements of its misappropriation claims. Doc. 48 at 14-20.

In response, Defendant argues he did not misappropriate Plaintiff's trade secrets because: (1) Plaintiff consented to Defendant's "arrangement" of sending confidential information and documents from his business email account to his personal account and, therefore, Defendant did not acquire any trade secrets by improper means; (2) Defendant did not disclose Plaintiff's trade secrets to any third party; and (3) Defendant did not use Plaintiff's trade secrets for his personal benefit to the detriment of Plaintiff. Doc. 57 at 14. For the following reasons, the Court finds there is no genuine issue of material fact that Defendant misappropriated Plaintiff's trade secrets in violation of the DTSA and the KUTSA. The Court therefore grants Plaintiff's request for summary judgment on Counts V and VI.

The DTSA and the KUTSA provide a private cause of action for misappropriation of a trade secret. *See* 18 U.S.C. § 1836(b)(1); K.S.A. § 60-3321. The elements required to establish a claim for misappropriation are essentially the same under both the DTSA and the KUTSA. To

establish such a claim, a plaintiff must show: (1) the existence of a trade secret;[4] (2) the acquisition, use, or disclosure of the trade secret without consent; and (3) that the individual acquiring, using, or disclosing the trade secret knew or should have known the trade secret was acquired by improper means. *See, e.g.*, *Video Gaming Techs., Inc. v. Castle Hill Studios LLC*, 2018 WL 3437083, at *4 (N.D. Okla. 2018) (listing elements of misappropriation claim under the DTSA); *Arctic Energy Servs., LLC v. Neal*, 2018 WL 1010939, at *2 (D. Colo. 2018) (same); *Chris-Leef Gen. Agency, Inc. v. Rising Star Ins. Inc.*, 2011 WL 5039141, at *4 (D. Kan. 2011) (listing elements of KUTSA misappropriation claim (citing K.S.A. § 60-3320)).[5]

For purposes of the first element, the DTSA defines "trade secret" broadly to include "all forms and types of financial, business, scientific, technical, economic, or engineering information" so long as (1) the owner of the trade secret has taken "reasonable measures to keep such information secret" and (2) such information "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by," another person. 18 U.S.C. § 1839(3). The KUTSA's definition of "trade secret" closely mirrors that of the DTSA. *See* K.S.A. § 60-3320(4) (defining "trade secret" as information (1) that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use," and (2) that "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy").

---

[4] Under the DTSA, the trade secret must also "relate[] to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1); *see also Video Gaming Techs., Inc. v. Castle Hill Studios LLC*, 2018 WL 3437083, at *4 (N.D. Okla. 2018); *Arctic Energy Servs., LLC v. Neal*, 2018 WL 1010939, at *2 (D. Colo. 2018).

[5] As noted by Plaintiff in its motion for summary judgment (Doc. 48 at 15), there does not appear to be any controlling decision regarding the elements required to establish a misappropriation claim under the recently-enacted DTSA. The Court therefore looks to the decisions of other district courts in this Circuit for guidance.

Both the DTSA and the KUTSA also authorize courts to enter injunctive relief in cases of actual or threatened misappropriation. *See* 18 U.S.C. § 1836(b)(3)(A) (authorizing a court to "grant an injunction . . . to prevent any actual or threatened misappropriation"); K.S.A. § 60-3321(a) (providing that "[a]ctual or threatened misappropriation may be enjoined").

The Court finds the uncontroverted facts show that Plaintiff has established each element of its claims for misappropriation under the DTSA and the KUTSA. First, Plaintiff has established the existence of a trade secret. Plaintiff identifies several categories of confidential and proprietary information that it contends constitute trade secrets—and which are included within in its response to the Hallmark RFQ—such as information related to quality control, customer strategies, and pricing. Doc. 46 at ¶ 10. The uncontroverted evidence shows this information meets the standard to qualify as "trade secrets" of Plaintiff. Plaintiff has taken reasonable measures to keep this information secret by requiring employees (such as Defendant) to sign the Agreement, which contains non-disclosure and non-competition language ostensibly preventing employees from disclosing and using such information without consent. *Id.* at ¶ 11; Doc. 48 at 12 ¶ 52; Doc. 57 at 12 ¶ 52. Such information also derives value from not being generally known to, and not being readily ascertainable through proper means by, other persons. Doc. 48 at 12 ¶¶ 53-55; Doc. 57 at 12 ¶¶ 53-55. Plaintiff asserts—and Defendant does not contest—that it derives independent economic value from keeping information regarding customer lists, sales results, and product lines secret. Doc. 48 at 12 ¶ 55; Doc. 57 at 12 ¶ 55. The Court therefore finds that the first element of Plaintiff's misappropriation claims is satisfied. Indeed, Defendant himself stipulates that this information constitutes trade secrets of Plaintiff. Doc. 46 at ¶ 10.

Second, the uncontroverted evidence shows that Defendant used or disclosed documents containing these trade secrets without Plaintiff's consent. Through his position with Plaintiff,

Defendant admits he gained knowledge of and access to Plaintiff's trade secrets. *Id.* In August 2017, in the weeks following the submission of Plaintiff's response to an RFQ from one of its largest customers (Hallmark) and shortly before his voluntary resignation, Defendant transmitted multiple emails containing Plaintiff's trade secrets from his business email account to his personal account, without Plaintiff's permission. *Id.* at ¶¶ 33-35. Specifically, these emails included Plaintiff's response to the Hallmark RFQ, which included information regarding Plaintiff's strategies and pricing, which, as discussed above, constitutes Plaintiff's trade secrets. *Id.* at ¶ 33; Doc. 53. Defendant did not return the emails and associated documents when he left Plaintiff's employment until ordered to do so by the Court. Doc. 46 at ¶ 43.

In his opposition, Defendant argues he had Plaintiff's consent to send these materials to his personal email account because Plaintiff knew he worked from home and sent documents from his work email account to his personal account to facilitate this arrangement. Doc. 57 at 14. As an initial point, this argument does not account for Defendant's continued use and disclosure of these documents to his personal email account after his resignation. Defendant does not contend—or provide any evidence to suggest—Plaintiff consented to this continued disclosure after his employment ceased and, indeed, the Agreement expressly prohibits such retention. And, regardless, the only evidence Defendant presents to support this consent argument while employed by Plaintiff is his affidavit, which provides the following details about Defendant's work-from-home arrangement: that Plaintiff permitted Defendant to work from home during his employment; that Defendant corresponded with Plaintiff about confidential information, documents, and trade secrets while working from home and sent such information, documents, and trade secrets to and from his personal email account "frequently"; and that Plaintiff knew about this arrangement and permitted it. Doc. 57-1 at 1 ¶¶ 3-4. Defendant provides no further detail—such as the exact

frequency with which he worked from home—nor does he explain <u>why</u> he sent these particular documents to his personal account. Defendant also does not explain the timing surrounding the transmission. The record shows the documents were sent <u>after</u> Plaintiff's response to the RFQ was submitted—yet Defendant provides no explanation as to why he needed access to these documents, at home, after work on the RFQ response had concluded and the response had been submitted to Hallmark for consideration.

Meanwhile, the uncontroverted evidence weighs against Defendant's arguments, showing that Defendant was able to access Plaintiff's network remotely in the event he worked from home, thereby obviating any need to transmit messages and documents containing Plaintiff's trade secret information to his personal account. Doc. 48 at 11 ¶ 50; Doc. 57 at 11 ¶ 50. Defendant may not use his self-serving affidavit to create a fact issue precluding summary judgment. *See Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991) (although "[m]aterial factual disputes cannot be resolved at summary judgment based on conflicting affidavits . . . [t]o come within the protection of this rule . . . the nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; <u>conclusory and self-serving affidavits are not sufficient</u>" (emphasis added)). For the foregoing reasons, the Court finds Plaintiff has met the second element of its claims for misappropriation.

Third, the context of Defendant's actions (as evidenced by the uncontroverted facts) makes it clear he knew—or at the very least should have known—that the circumstances of his disclosure and use of Plaintiff's trade secrets were improper. On September 11, 2017, less than one month after sending the above-referenced documents and information to his personal email account, Defendant unexpectedly emailed Plaintiff his notice of resignation. Doc. 46 at ¶ 38. Two days later, Defendant advised his manager that Hallmark would be delaying the results of its RFQ

13

process by one month so it could test other foils. *Id.* at ¶ 39. And the very next day, Defendant spoke with Plaintiff's Human Resources Manager (Ms. Smith) and asked if he had a non-compete agreement with Plaintiff. *Id.* at ¶ 40. Ms. Smith advised that he did and showed him a copy of the Agreement. *Id.* Pursuant to that Agreement, Defendant agreed he would not disclose, use, or provide any of Plaintiff's confidential information or documents—either during his employment or at any time thereafter—for his own benefit or for the benefit of any third party. *Id.* at ¶ 20. Defendant further agreed he would not remove such materials from Plaintiff's premises without prior consent. *Id.* at ¶ 21. Defendant also agreed that, immediately upon termination of his employment, he would return all confidential information and documents to Plaintiff. *Id.* at ¶ 22.

Nevertheless, that is exactly what the uncontroverted evidence shows that Defendant did. As set forth above, when Defendant left Plaintiff's employment, he did not return any of the documents or information he sent to his personal email account. *Id.* at ¶ 43. Less than a month after his last day with Plaintiff, Defendant accepted employment with Plaintiff's direct competitor, Univacco, and met with Hallmark to test Univacco's foils. *Id.* at ¶¶ 42, 44, 46. And Defendant later produced a report for Univacco to provide to Hallmark. *Id.* at ¶ 46.

Based on the foregoing, it is uncontroverted that Defendant knew, or should have known, his disclosure and use of Plaintiff's trade secrets was improper. Plaintiff has therefore satisfied the final element of its misappropriation claims. The Court accordingly finds that the uncontroverted facts establish Defendant is liable for violation of the DTSA and the KUTSA.

### 2.    Attorney's Fees

Having found Defendant liable under the DTSA and the KUTSA for misappropriating Plaintiff's trade secrets, the Court turns to Plaintiff's request for summary judgment on its prayer for reasonable attorney's fees.

In a civil action for misappropriation under the DTSA or the KUTSA, a prevailing party may recover attorney's fees if the court finds the trade secret was "willfully" and "maliciously" misappropriated. *See* 18 U.S.C. § 1836(b)(3)(D) (a court has discretion to award reasonable attorney's fees to the prevailing party where it finds the trade secret was "willfully and maliciously misappropriated"); K.S.A. § 60-3323 (where "willful and malicious misappropriation exists, the court may award reasonable attorney's fees to the prevailing party").[6] In support of its request for summary judgment on its statutory fee claim, Plaintiff therefore argues the uncontroverted facts establish, as a matter of law, that Defendant acted willfully and maliciously in his misappropriation of its trade secrets. Doc. 48 at 20-21.

In response, Defendant contends he did not willfully and maliciously misappropriate Plaintiff's trade secrets because (1) he believed he had permission to send the information and documents to his personal email address pursuant to the aforementioned work-from-home arrangement, (2) he did not intend his actions to injure Plaintiff, and (3) he never actually caused Plaintiff any such injury. Doc. 57 at 14. For the following reasons, the Court finds a genuine issue of material fact exists regarding whether Defendant "willfully and maliciously" misappropriated Plaintiff's trade secrets, precluding summary judgment.

It appears neither the legislature nor the courts have defined what constitutes "willful" or "malicious" conduct in the context of reasonable attorney's fees under either the DTSA or the KUTSA. In its motion, Plaintiff advances the argument that "willful" misappropriation means "done with actual or constructive knowledge of its probable consequences" and "malicious" misappropriation means "done with intent to cause injury." Doc. 48 at 21 (citing 1 MILGRIM ON

---

[6] The Court notes that, although it previously found that Defendant's misappropriation was improper, it does not necessarily follow that the misappropriation was willful and malicious.

TRADE SECRETS § 1.01 (2018)). The plaintiff bears the burden of establishing willful and malicious misappropriation. 1 MILGRIM ON TRADE SECRETS § 1.01 (2018).

Plaintiff contends Defendant acted "willfully" because he had actual and constructive knowledge of the probable consequences of his actions, given the RFQ from Hallmark and his role as Plaintiff's manager for the Hallmark account Doc. 48 at 21. And in support of its argument that Defendant's actions were also malicious, Plaintiff simply concludes that the stipulated facts show, as a matter of law, that Defendant "consciously disregarded [Plaintiff's] rights in [its] trade secrets for his own personal gain and to the direct detriment and injury to [Plaintiff]." *Id.* But Plaintiff does not identify the stipulated facts it contends show such an intent. Indeed, the Court disagrees that the uncontroverted evidence establishes Defendant acted with "intent to cause injury" to Plaintiff in misappropriating its trade secrets.

For these reasons, the Court therefore finds that whether Defendant acted willfully and maliciously in misappropriating Plaintiff's trade secrets raises a question of fact and is inappropriate for summary judgment. Accordingly, the Court denies Plaintiff's request for summary judgment on its statutory fee claim.

### B.     Defendant's Motion for Summary Judgment (Doc. 50)

In its opposition, Plaintiff makes clear it only seeks relief under Counts I through VI of the complaint.[7] Doc. 56 at 4-5. Therefore, the Court addresses Defendant's arguments in favor of summary judgment only with respect to those claims Plaintiff continues to pursue: Count I (breach of contract related to the non-disclosure provisions), Count II (breach of contract related to the non-competition provisions), Count III (breach of contract related to the non-solicitation

---

[7] Plaintiff originally asserted twelve causes of action (*see supra* note 1 and accompanying text). However, Plaintiff states that, during the pretrial conference, it abandoned all but Counts I through VII of the complaint. Doc. 56 at 4. Plaintiff now further agrees to voluntarily dismiss Count VII for violations of the federal Computer Fraud and Abuse Act. *Id.* at 4-5. This leaves only Counts I through VI for disposition.

provisions), Count IV (breach of the duty of good faith and fair dealing), Count V (violation of the DTSA), and Count VI (violation of the KUTSA).

Defendant attacks these claims primarily on the basis that Plaintiff cannot prove any actual damages, which he contends are necessary to show an entitlement to relief. The Court first analyzes Defendant's arguments in favor of summary judgment on Counts I through III—the breach of contract claims.

### 1.     Breach of Contract Claims (Counts I, II, and III)

As discussed above, Defendant moves for summary judgment on each of Plaintiff's breach of contract claims: its claim for breach of the Agreement's non-disclosure provisions, its claim for breach of the Agreement's non-competition provisions, and its claim for breach of the Agreement's non-solicitation provisions.

Under Kansas law, "[t]he elements of a breach of contract claim are: (1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach." *Stechschulte v. Jennings*, 298 P.3d 1083, 1098 (Kan. 2013).[8] Defendant's summary judgment argument is premised entirely on the fifth element (damages). Doc. 51 at 10-11. Defendant argues each of the breach of contract claims fails because Plaintiff has sustained no actual damages, which he contends are required to satisfy this final element of Plaintiff's prima facie case. *Id.* In response, Plaintiff argues it was not required to prove monetary damages to prevail on its breach of contract claims and, rather,

---

[8] Although stipulating that New Jersey law applies for purposes of "analysis and interpretation" of the Agreement (Doc. 46 at ¶ 13), in their briefing the parties exclusively cite Kansas law to provide the elements of, and relevant law concerning, Plaintiff's breach of contract claims. The Court therefore looks to Kansas to supply the applicable law. But to the extent there is any dispute regarding this issue, the Court has found no pertinent difference between the applicable breach of contract principles under New Jersey and Kansas law.

injunctive relief is a proper remedy regardless of whether actual damages are sought. Doc. 56 at 25-26.

The Court agrees with Plaintiff. Although the "classic remedy" for breach of contract is an award of monetary damages, "if damages at law cannot adequately compensate the injury sustained from the breach or cannot be reasonably measured, then the remedy at law is inadequate and injunctive relief . . . may be appropriate because of irreparable injury." *Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*, 874 F.2d 1346, 1353-54 (10th Cir. 1989). Plaintiff is thus not required to prove monetary damages to establish its breach of contract claims. Rather, it may—as it has—seek injunctive relief for the alleged breach. Indeed, the nature of the harm Plaintiff alleges here—loss of customers, loss of good will, loss of competitive advantage, and the like—are viewed as sources of irreparable harm justifying injunctive relief because of the difficulty in measuring those losses in monetary terms and in "regaining the business of customers who are being, and will be, induced away or lost." *Inter-Collegiate Press, Inc. v. Myers*, 519 F. Supp. 765, 770 (D. Kan. 1981); *see also Heatron, Inc. v. Shackelford*, 898 F. Supp. 1491, 1502 (D. Kan. 1995) (finding irreparable harm where "it would be impossible to precisely calculate the amount of damages [the plaintiff] would suffer because of the inherent difficulty in quantifying the loss of [the plaintiff's] competitive advantage in the marketplace, and the damages resulting from loss of customers and good will"); *Sizewise Rentals, Inc. v. Mediq/PRN Life Support Servs., Inc.*, 87 F. Supp. 2d 1194, 1200 (D. Kan. 2000) (holding that the damages to plaintiff's "interests in good will, brand recognition, customer contacts, and referral sources cannot be measured in numerical or monetary terms"). The Court accordingly denies Defendant's request for summary judgment on Counts I, II, and III for breach of contract.

## 2. Breach of the Duty of Good Faith and Fair Dealing (Count IV)

In Count IV, Plaintiff asserts Defendant further breached the Agreement by violating the inherent duty of good faith and fair dealing. Defendant argues it is entitled to summary judgment on Count IV for two reasons: (1) as with Plaintiff's breach of contract claims, Plaintiff has sustained no damages from any alleged breach; and (2) employment-at-will contracts, such as Defendant's contract with Plaintiff, are excepted from the good-faith obligation in Kansas. Doc. 51 at 11.[9] For the following reasons, the Court denies Defendant's request for summary judgment on Count IV.

First, the Court rejects Defendant's damages argument for the same reasons discussed in Part III.B.1 above. Second, the Court likewise rejects Defendant's argument that the Agreement is excepted from the good-faith obligation as an employment-at-will contract. The duty of good faith and fair dealing generally requires that each party to the contract refrain from intentionally and purposely doing anything that will destroy or injure the right of the other party to "receive the fruits of the contract." *Waste Connections of Kan., Inc. v. Ritchie Corp.*, 298 P.3d 250, 266 (Kan. 2013) (quoting *Bonanza, Inc. v. McLean*, 747 P.2d 792, 801 (Kan. 1987)). Defendant is correct that, although Kansas courts imply a duty of good faith and fair dealing in every contract, employment-at-will contracts are excepted from this requirement. *See Daniels v. Army Nat'l Bank*, 822 P.2d 39, 43 (Kan. 1991); *Ritchie*, 298 P.3d at 265.

Although the contract containing the non-disclosure, non-competition, and non-solicitation provisions that Plaintiff alleges were breached—i.e., the Agreement—contains "employment-at-will" language, it is not, as Plaintiff points out in its opposition, merely an employment-at-will contract. Therefore, it carries the implied obligation of good faith and fair dealing. Defendant has

---

[9] It is axiomatic that the Court is limited to the arguments raised by the parties.

not demonstrated that this claim fails as a matter of law. And whether this duty has been violated generally raises a question of fact. *Ritchie*, 298 P.3d at 265. The Court therefore denies Defendant's request for summary judgment on Plaintiff's claim for breach of the duty of good faith and fair dealing.

### 3.     Violation of the DTSA (Count V)

Defendant next argues he is entitled to summary judgment on Plaintiff's claim under the DTSA. As with Plaintiff's claims for breach of contract and breach of the duty of good faith and fair dealing, Defendant primarily attacks Plaintiff's DTSA claim on the basis of damages. Specifically, Defendant first argues that only specific categories of monetary damages are authorized under the DTSA and, because Plaintiff has abandoned any claim for monetary damages (except attorney's fees), Plaintiff's DTSA claim necessarily fails. Doc. 51 at 4-5. Second, Defendant argues that Plaintiff is not entitled to attorney's fees because Plaintiff cannot show Defendant willfully and maliciously misappropriated Plaintiff's trade secrets. *Id.* at 5. Third, Defendant contends Plaintiff cannot establish that a trade secret, as defined under the DTSA, has been misappropriated. *Id.*

The law relevant to Plaintiff's DTSA claim is set forth fully in Part III.A.1, *supra*. But—because particularly pertinent to its analysis of Defendant's request for summary judgment on this claim—the Court reiterates that injunctive relief is available as a remedy under the DTSA. *See* 18 U.S.C. § 1836(b)(3)(A)-(B) (authorizing a court to "grant an injunction . . . to prevent any actual or threatened misappropriation" <u>or</u> to award "damages for actual loss caused by the misappropriation of the trade secret"). Put differently, monetary damages are not the only form of relief authorized by the DTSA.

For these reasons, the Court rejects Defendant's first argument—that Plaintiff's DTSA claim fails as a matter of law because Plaintiff does not seek monetary damages. Plaintiff is entitled to seek injunctive relief for Defendant's misappropriation, which it has done. This also disposes of Defendant's second argument in favor of summary judgment (that Plaintiff cannot recover on its DTSA claim because it cannot establish an entitlement to attorney's fees). Finally, consistent with its reasoning and holding in connection with Plaintiff's motion for summary judgment (*see supra* Part III.A.1), the Court rejects Defendant's third argument that Plaintiff cannot show misappropriation of a trade secret so as to establish its claim under the DTSA. The Court therefore denies Defendant's request for summary judgment on Count V for violation of the DTSA and, for the reasons set forth in Part III.A.1, *supra*, finds Plaintiff is entitled to summary judgment on this claim.

### 4.      Violation of the KUTSA (Count VI)

Finally, the Court addresses Defendant's request for summary judgment on Plaintiff's KUTSA claim. Defendant's arguments largely mirror his arguments with respect to Plaintiff's DTSA claim—in other words, Defendant primarily contends Plaintiff's KUTSA claim fails because Plaintiff has not sustained any actual damages as a result of the misappropriation. Doc. 51 at 7-8.

The Court's analysis here likewise mirrors its analysis of Defendant's request for summary judgment on Plaintiff's DTSA claim. Like the DTSA, the KUTSA expressly authorizes injunctive relief as a remedy in cases of actual or threatened misappropriation. *See* K.S.A. § 60-3321(a) (providing that "[a]ctual or threatened misappropriation may be enjoined"). Contrary to Defendant's contentions, a showing of monetary damages is not required. The Court therefore denies Defendant's request for summary judgment on Count VI for violation of the KUTSA and,

rather, for the reasons set forth in Part III.A.1, *supra*, enters summary judgment in Plaintiff's favor on this claim.

## IV.     CONCLUSION

THE COURT THEREFORE ORDERS that Plaintiff's Motion for Partial Summary Judgment (Doc. 47) is GRANTED IN PART and DENIED IN PART as set forth in Part III.A, *supra*.

THE COURT FURTHER ORDERS that Defendant's Motion for Summary Judgment (Doc. 50) is DENIED.

THE COURT FURTHER ORDERS that the parties submit an amended pretrial order reflecting Plaintiff's voluntary dismissal of Count VII and its abandonment of Counts VIII through XIII within seven days of the date of this order.

IT IS SO ORDERED.

Dated: April 5, 2019                                      /s/  *Holly L. Teeter*
                                                                       HOLLY L. TEETER
                                                                       UNITED STATES DISTRICT JUDGE